UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN SALES COMPANY, INC., on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WARNER CHILCOTT HOLDINGS COMPANY III, LTD.; WARNER CHILCOTT CORPORATION; WARNER CHILCOTT (US) INC.; GALEN (CHEMICALS) LTD.; and BARR PHARMACEUTICALS, INC.,<br><br>Defendants. | No.<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

American Sales Company, Inc. ("Plaintiff") brings this class action on behalf of itself and all others similarly situated, and for its Complaint against Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US) Inc., Galen (Chemicals) Ltd. (collectively "Warner Chilcott"), and Barr Pharmaceuticals, Inc. ("Barr") (Warner Chilcott and Barr may also be collectively referred to as "Defendants") states as follows:

**NATURE OF THE ACTION**

1. Plaintiffs bring this action on behalf of all persons and entities that purchased Ovcon directly from Warner Chilcott from April 22, 2004 through the present and were harmed by the horizontal agreement not to compete between Warner Chilcott and Barr, two sellers of prescription drugs, with respect to the drug Ovcon 35 ("Ovcon"), an oral contraceptive used to prevent pregnancy. Barr is the only company approved by the United States Food and Drug Administration ("FDA") to sell a generic version of Ovcon in competition with Warner Chilcott's branded Ovcon.

-1-

2. Prior to entry of the horizonal agreement not to compete, Barr planned to sell its lower-priced generic Ovcon once Barr received FDA approval. Both Warner Chilcott and Barr predicted that entry of Barr's lower-priced generic into the market would reduce Warner Chilcott's sales of the higher-priced branded Ovcon by 50 percent in the first year alone. To forestall this competitive threat and to protect its Ovcon sales, Warner Chilcott entered into an agreement with Barr preventing entry of Barr's generic Ovcon into the United States for five years in exchange for a payment to Barr of $20 million.

3. Absent Defendants' anti-competitive conduct and agreement, Plaintiff and the other Class members would have paid less for Ovcon and/or would have purchased a lower-cost generic alternative to Warner Chilcott's higher-priced branded Ovcon during the Class Period. Prices for these products would have been lower with unfettered competition because absent the exclusionary conduct: (a) Warner Chilcott's prices to members of the Class for Ovcon would have been lower; and (b) members of the Class would have replaced some of their Ovcon purchases from Warner Chilcott with less expensive generic alternatives sold by Barr or other generic manufacturers. As a result of Defendants' unlawful conduct, Plaintiffs and the other Class members paid overcharges on their purchases of Ovcon throughout the Class Period.

## JURISDICTION AND VENUE

4. Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees for Defendants violations of Section 1 of the Sherman Act, 15 U.S.C. §§ 1. Subject matter jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C §§ 1331 and 1337, because the action arises under the laws of the United States.

5. Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of the events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

6. The Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

## THE PARTIES

7. Plaintiff American Sales Company, Inc. is a corporation organized under the law of the State of Delaware and is located in Erie County, New York. American Sales provides purchasing and distribution services in health and beauty care items, pharmacy and general merchandise to the U.S. retail arenas. During the Class Period, American Sales purchased Ovcon directly from Warner Chilcott and was injured thereby.

8. Defendant Warner Chilcott Holdings Company III, Ltd. is a privately-owned, for-profit company organized, existing, and doing business under and by virtue of the laws of Bermuda, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129. Warner Chilcott Holdings Company III, Ltd., through its direct and indirect subsidiaries, is engaged in the discovery, development, manufacturing, and distribution of pharmaceutical products in the United States, including Ovcon.

9. Defendant Warner Chilcott Corporation is a wholly-owned indirect subsidiary of Warner Chilcott Holdings Company III, Ltd. and is the direct 100% shareholder of Warner Chilcott (U.S.) Inc. Warner Chilcott Corporation is organized, existing, and doing business under and by virtue of

the laws of the State of Delaware, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

10. Defendant Warner Chilcott (U.S.) Inc., is a wholly-owned subsidiary of Warner Chilcott Corporation. Warner Chilcott (U.S.) Inc., is organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

11. Warner Chilcott acquired Ovcon, which was originally approved by the FDA in 1976, and is not subject to patent protection, from Bristol-Myers Squibb Company on January 26, 2000. As part of the acquisition, Bristol-Myers Squibb Company agreed to supply (and has supplied) Ovon to Warner Chilcott. Ovcon's net dollar sales have more than doubled since 2000, even as Warner Chilcott has raised Ovcon's price. Ovcon is, and has been, one of Warner Chilcott's highest revenue-producing products, and has been sold by Warner Chilcott at a price substantially above Warner Chilcott's cost of acquiring the product. For the twelve months ending September 30, 2004, Warner Chilcott's net sales of Ovcon were approximately $71.5 million.

12. Galen (Chemicals) Ltd., is organized, existing, and doing business under and by virtue of the laws of the Republic of Ireland. Galen Chemicals' office and principal place of business is located at Unit 4, Burton Hall Pk., Sandyford Industrial Estate, Foxrock, Ireland. Galen Chemicals is directly or indirectly owned or controlled by Warner Chilcott Holdings Company III, Ltd. Galen Chemicals entered into the anticompetitive agreement that prevents Barr's generic Ovcon entry challenged herein.

13. Defendant Barr is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware. Barr's office and principal place of business is located at 2

Quaker Road, P.O. Box 2900, Pomona, New York 10970-0519. Barr is engaged in the business of, among other things, developing, manufacturing, marketing, and distributing generic oral contraceptive products.

## FACTS

### A.   The Regulatory Framework

14. The Federal Food, Drug and Cosmetic Act ("FDCA") regulates the manufacture and distribution of drugs and medical devices in the United States, 21 U.S.C. § 301 *et seq.*  Under the FDCA, premarket approval by the Food and Drug Administration ("FDA") is required before a company may begin selling a new drug, often referred to as a "pioneer" or "branded" drug, in interstate commerce in the United States.  21 U.S.C. § 355(a).  Premarket approval for a new drug must be sought by filing a new drug application ("NDA") with the FDA under § 355(b) of the FDCA, demonstrating that the drug is safe and effective for its intended use.

15. Once the FDA approves the safety and effectiveness of a new prescription drug, it may be used in the United States only under the direction and care of a doctor who writes a prescription specifying the drug, which must be purchased from a licensed pharmacist.  The pharmacist will then dispense the drug specified by the physician unless a generic version is available that has been approved by the FDA for substitution as the bioequivalent of the prescription drug.

16. Generic drugs are drugs that the FDA has found to be "bioequivalent" to their corresponding brand name drugs.  A generic drug is bioequivalent if it proves the identical therapeutic benefits and has the same active chemical composition as its brand name counterpart.  When a generic drug is completely equivalent to a brand name drug, the FDA assigns the generic drug an "AB" rating.

17. Generic drugs are invariably priced substantially below the branded drugs to which they are

bioequivalent. Typically, the first generic drug is sold at a modest discount compared to the brand name drug, with discounts increasing as more companies begin selling the generic. As additional generic competitors come to market, the price of the generic equivalents continues to decrease. In some cases, generic competitors sell products equivalent to brand name prescription drugs for a little as 15 percent of the price of the brand name drug, and capture as much as 90 percent of the market for that drug. Unless the branded manufacturer lowers prices to meet competition, a branded drug loses a significant portion of its market share to generic competitors less than a year after the introduction of generic competition.

18. Moreover, if a lower-priced generic version of a brand name drug exists, and the physician has not specifically indicated on the prescription "dispense as written" (or a similar instruction), typically, the pharmacist will substitute, or at least offer to substitute, the generic drug.

19. Once a physician writes a prescription for a brand name drug such as Ovcon, that prescription defines and limits the market to the brand name drug or its AB-rated generic equivalent. A pharmacist may substitute only drugs that carry the FDA's AB generic rating for a physician's prescription for a brand name drug.

20. The Hatch-Waxman Amendments provide that companies may seek approval to produce and market a generic form of a previously approved or "pioneer" drug by filing an Abbreviated New Drug Application ("ANDA") that relies on the safety and effectiveness findings reported in the NDA for the previously approved drug.

**B.    Barr's Impending Generic Entry Into Ovcon Market**

21. In September 2001, Barr filed an ANDA with the FDA for approval to manufacture and sell an AB-rated generic version of Ovcon. By January 2003, Barr publicly announced its intention to

market generic Ovcon by the end of the year.

22. Barr planned to price generic Ovcon at approximately 30 percent less than the price that Warner Chilcott charges for branded Ovcon, and projected that its generic Ovcon would capture approximately 50 percent of Warner Chilcott's branded Ovcon sales within the first year of introduction.

23. Similarly, Warner Chilcott expected that Barr would price its generic Ovcon at approximately 30 percent less than the price Warner Chilcott charges for branded Ovcon. Warner Chilcott projected that generic Ovcon would capture at least 50 percent of Ovcon's new prescription sales within the first year of introduction. Warner Chilcott calculated that, as a result of these lost prescriptions, its net revenues from the sale of branded Ovcon would decline by at least $100 million over a three year period.

24. Within five months of Barr's announcement, Warner Chilcott's chief financial officer warned the company's Board of Directors that generic Ovcon entry was the "biggest risk to the company."

    C.    **Defendants' Anti-Competitive Agreement**

25. In August 2003, Warner Chilcott and Barr discussed a possible business arrangement under which Barr would agree to refrain from competing in the United States with its generic Ovcon product.

26. Those discussions resulted in the execution of a letter of intent on September 10, 2003. According to the letter of intent, Warner Chilcott would pay Barr $20 million and Barr would not compete in the United States for five years with its generic Ovcon product when Barr received final FDA approval. Instead of entering and competing, Barr would agree to be available as a second supplier of Ovcon to Warner Chilcott if Warner Chilcott so requested.

27. In February 2004, FTC staff notified Warner Chilcott and Barr that it intended to investigate the non-compete agreement outlined in the Defendant's letter of intent because of its potential to significantly reduce competition by eliminating the only generic alternative to Ovcon.

28. On March 24, 2004, the Defendants signed their Final Agreement implementing the letter of intent. Warner Chilcott paid Barr $1 million upon signing the Final Agreement. Under the Final Agreement, within 45 days after the FDA approved Barr's generic Ovcon ANDA, Warner Chilcott could elect to pay the remaining $19 million to secure Barr's agreement to refrain from marketing generic Ovcon in the United States, either by itself or through a licensee, for five years. The Final Agreement referred to this arrangement as Warner Chilcott's option to an exclusive license to Barr's ANDA for generic Ovcon.

29. In addition, the Final Agreement gave Warner Chilcott the ability to purchase Ovcon supply from Barr, pursuant to specified payment terms. The ability to purchase supply from Barr would arise, however, only after Barr received final FDA approval for its generic Ovcon. Both Warner Chilcott and Barr understood that if, upon receiving FDA approval, Barr went ahead and entered the market with its generic Ovcon product, Warner Chilcott's Ovcon supply needs would immediately be drastically reduced.

30. On April 22, 2004, the FDA approved Barr's ANDA to produce and market generic Ovcon. On April 23, 2004, Barr publicly announced its intention to market generic Ovcon if Warner Chilcott chose not to exercise its exclusive license option. However, on May 6, 2004, Warner Chilcott exercised the exclusive license option under the Final Agreement by paying Barr $19 million.

31. Warner Chilcott did not begin purchasing Ovcon supply from Barr at that time, but instead continued to purchase Ovcon supply solely from Bristol-Myers Squibb Co., until about May 2005.

Under the terms of the Final Agreement, Barr cannot sell generic Ovcon in the United States for five years, or until approximately May 2009. Absent its agreement not to compete with Warner Chilcott, Barr would have started selling generic Ovcon shortly after receiving final FDA approval in April 2004.

32. Entry of Barr's generic Ovcon into the United States would have quickly and significantly reduced the sales of Warner Chilcott's branded Ovcon, and lead to a significant reduction in the average price purchasers paid for Ovcon products. Barr has abided by its agreement not to sell generic Ovcon in the United States. As of the date of this complaint, Barr remains the only company that has received approval from the FDA to make an AB-rated generic version of Ovcon.

## RELEVANT MARKET

33. The relevant product market is the market for the sale of Ovcon and its AB rated generic equivalents.

34. The relevant geographic market is the United States as a whole.

35. At all relevant times, Warner Chilcott's market share in the relevant product and geographic markets was 100%.

## CLASS ALLEGATIONS

36. ***Numerosity***: Joinder of all Class members is impracticable. While the size of the Class is not yet known with certainty, based on the nature of the trade and commerce involved, Plaintiff reasonably believes that the Class numbers potentially in the hundreds, if not thousands. Class members are geographically dispersed throughout the United States. The Class members are readily identifiable from information and records in Warner Chilcott's exclusive possession.

37. ***Commonality***: Questions of law and fact are common to the Class, including, but not limited

to:

    a. whether the agreement not to compete among Defendants is a *per se* violation of the Sherman Act;

    b. whether Defendants engaged in agreements, contracts, combinations, and conspiracies, which had the purpose and/or effect of unreasonably restraining competition and limiting purchaser access to generic Ovcon;

    c. whether Defendants' unreasonably anti-competitive contracts, combinations, and conspiracies have caused Plaintiff and the other members of the Class to suffer antitrust injury in the nature of overcharges;

    d. whether Defendants' unlawful conduct caused Plaintiff and other Class members to pay more for Ovcon than they otherwise would have paid;

    e. the appropriate Class-wide measure of damages; and

    f. whether Defendants' anti-competitive conduct is continuing, thus entitling the Class to injunctive relief to promote unrestrained trade and free and fair competition.

38. ***Typicality***: Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and other Class members are direct purchasers of Ovcon and were overcharged and thus injured by the same wrongful conduct of Defendants. Defendants' violation of the antitrust laws, the effects of such violations, and the relief sought are all issues or questions that are common to Plaintiff and the other Class members.

39. ***Adequacy:*** As representative of the Class, Plaintiff will fairly and adequately protect the interests of all Class members

40. ***Predominance***: The questions of law and fact that are common to the members of the Class predominate over any questions affecting only individual Class members. Whatever possible difficulties may exist in the management of the class action are greatly outweighed by the advantages of the class action procedure. Those advantages include, but are not limited to, providing Class members with a method for redress of claims that might otherwise not warrant individual litigation.

41. ***Superiority***: Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. A class action enables injured persons or entities to obtain redress on claims that might not be practicable to pursue individually. Class treatment also eliminates the potential for inconsistent adjudications.

## COUNT I

### Sherman Act § 1

42. Plaintiff incorporates by reference all of the foregoing allegations as though fully set forth herein.

43. Section 1 of the Sherman Act prohibits every unreasonable contract, combination or conspiracy in restraint of trade. 15 U.S.C. § 1.

44. Prior to, and during, the Class Period, Defendants agreed, conspired and colluded to allocate the market for Ovcon by eliminating generic competition for at least five years. Such conduct constitutes an illegal agreement, combination and conspiracy in restraint of trade in violation of

Section 1 of the Sherman Act. 15 U.S.C. § 1.

45. As alleged above, there was no legitimate business justification for the agreement, collusion and conspiracy between Defendants that: (a) substantially foreclosed and excluded competition from generic competition for Ovcon; and (b) resulted in Warner Chilcott's willful maintenance and unlawful exercise of monopoly power in the relevant markets.

46. Defendants' collusion, agreement and conspiracy alleged herein has enabled and assisted Warner Chilcott in: (a) effectively excluding less expensive, competitive products from the relevant market; (b) maintaining Warner Chilcott's 100% market share and monopoly power in the relevant market; and (d) otherwise reaping the benefits of its illegal monopoly power. The anti-competitive effects of Defendants' collusive and conspiratorial conduct far outweighs any conceivable procompetitive benefits or justifications.

47. Plaintiff and members of the Class were injured in their business or property by the agreement, collusion and conspiracy alleged above which facilitated, enabled, assisted or furthered Warner Chilcott's substantial foreclosure and exclusion of competition and monopolization of the relevant market. Without limiting the generality of the foregoing, Plaintiff and the other members of the Class have been forced to pay higher prices for Ovcon than they would have paid in the absence of Defendants' unlawful conduct.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs on behalf of itself and the Class, respectfully requests that:

(i)  The Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23, be given to the Class;

(ii) The acts alleged herein be adjudged and decreed to be a *per se* violation of Section 1 of the Sherman Act;

(iii) Each member of the Class recover threefold the damages determined to have been sustained by each of them, and that judgment be entered against Defendant in favor of the Class;

(iv) The Class recover its costs of suit, including reasonable attorneys' fees and costs as provided by law; and

(v) The Class be granted such other appropriate relief as may be determined to be just, equitable, and proper by this Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: December 6, 2005

Respectfully submitted,

By: _____
CUNEO GILBERT & LaDUCA, LLP

Jonathan W. Cuneo (Bar No. 939389)
David W. Stanley (Bar No. 174318)
William H. Anderson
CUNEO GILBERT & LaDUCA, LLP
507 C Street, N.E.
Washington, DC 20002
202.789.3960

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
206.623.7292

Thomas M. Sobol
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA 02142
617.482.3700

Elizabeth A. Fegan
Timothy A. Scott
HAGENS BERMAN SOBOL SHAPIRO LLP
60 West Randolph Street, Suite 200
Chicago, IL 60601
312.762.9237