FILED
NOV 1 4 2005
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------------------x
LOUISIANA WHOLESALE DRUG CO., INC.,
    2085 I-49
    South Service Road
    Sunset, Louisiana 70584
on behalf of itself and all others similarly situated,

             Plaintiff,

      v.

WARNER CHILCOTT PUBLIC LIMITED
COMPANY, WARNER CHILCOTT
HOLDINGS COMPANY III, LTD., WARNER
CHILCOTT CORPORATION, WARNER
CHILCOTT (US) INC., GALEN (CHEMICALS)
LTD., and BARR PHARMACEUTICALS, INC.

             Defendants.
---------------------------------------------x

CLASS ACTION COMPLAINT

JURY DEMANDED

CASE NUMBER 1:05CV02210

JUDGE: Colleen Kollar-Kotelly

DECK TYPE: Antitrust

DATE STAMP: 11/14/2005

    Plaintiff, on behalf of itself and all others similarly situated, for its Class Action Complaint ("Complaint") against Defendants, alleges as follows based on: (a) personal knowledge; (b) the investigation of its counsel; (c) the examination of a related complaint filed against Defendants by the Federal Trade Commission on November 7, 2005 in the District Court for the District of Columbia; and (d) information and belief;

## I. NATURE OF THE ACTION

    1.    This is a civil antitrust action seeking treble damages and other relief arising out of the unlawful actions of Defendants Warner Chilcott Public Limited Company (formerly Galen Holdings PLC), Warner Chilcott Holdings Company III, Limited, Warner Chilcott Corporation,

1

Warner Chilcott (US) Inc., Galen (Chemicals) Limited (collectively "Warner Chilcott"), and its co-conspirator Barr Pharmaceuticals, Inc. ("Barr").

2. Warner Chilcott and Barr, both of whom are sellers of prescription drugs, unreasonably restrained the sale of the AB-rated, generic equivalent of defendant Warner Chilcott's brand-name drug, Ovcon 35, by entering into a horizontal agreement not to compete in the United States market.

3. Warner Chilcott sells Ovcon 35, a frequently prescribed prescription-only oral contraceptive used to prevent pregnancy. Barr is the only company approved by the United States Food and Drug Administration ("FDA") to sell a generic version of Ovcon 35 in competition with Warner Chilcott's branded Ovcon 35.

4. Prior to the challenged agreement, Barr planned to compete with Warner Chilcott by selling Barr's lower-priced generic Ovcon 35 once Barr received FDA approval. Both Warner Chilcott and Barr predicted that entry of Barr's lower-priced generic into the market would reduce Warner Chilcott's higher priced branded Ovcon 35 sales by capturing approximately 50 percent of the Ovcon 35 sales in the first year alone.

5. To forestall this threat and to protect its Ovcon 35 sales, Warner Chilcott entered into an agreement with Barr which prevented entry of Barr's generic Ovcon 35 into the United States market since April 2004. In exchange for Barr's agreement to keep its generic Ovcon 35 off the market for 5 (five) years, Warner Chilcott paid Barr $20 million.

6. As alleged below, Defendants' agreement is a naked restraint of trade among horizontal competitors, and accordingly, constitutes a per se violation of Section 1 of the Sherman Act. As a result of the agreement, there is no generic competition for Ovcon 35. But for

2

the challenged agreement, such generic competition could have and would have begun in or about April 2004 when Barr received final FDA approval to market its AB-rated generic version of Ovcon 35. Absent Defendants' illegal agreement, Barr would have sold its generic version of Ovcon 35 in the United States since at least April 2004, at prices significantly lower than the price of brand-name Ovcon 35. Thus, the Defendants' agreement caused direct purchasers of Ovcon 35 to incur substantial overcharges because, absent the agreement, direct purchasers would have: (a) substituted Barr's cheaper generic version for all or much of their purchases of brand-name Ovcon 35; and/or (b) paid substantially less for brand-name Ovcon 35, if it had faced generic competition.

## II. JURISDICTION AND VENUE

7. This Complaint is filed and these proceedings are instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including a reasonable attorneys' fee, for the injuries sustained by Plaintiff and members of the Class resulting from violations by the Defendants, as hereinafter alleged, of Section 1 of the Sherman Act, 15 U.S.C. § 1. The jurisdiction of this Court is based upon 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 15.

8. The Defendants named herein are found or transact business within this district, and the interstate trade and commerce, hereinafter described, was carried out, in substantial part, in this district. Venue, therefore, is appropriate within this district under 15 U.S.C. §§ 22 and 28 U.S.C. §§ 1391(b) and (c).

### III. THE PARTIES

9. Plaintiff Louisiana Wholesale Drug Company, Inc. ("Louisiana Wholesale") is a corporation organized under the laws of the State of Louisiana and is located at 2085 I-49, South Service Road, Sunset, Louisiana 70584. Plaintiff Louisiana Wholesale purchased the prescription drug Ovcon 35 directly from defendant Warner Chilcott during the Class Period, as defined below.

10. Defendant Warner Chilcott Public Limited Company (formerly Galen Holdings PLC), is a privately-owned, for-profit company organized, existing and doing business under and by virtue of the laws of Northern Ireland, with its office and principal place of business located at Old Belfast Road, Millbrook, Larne, BT40 2SH, County Antrim, United Kingdom.

11. Defendant Warner Chilcott Holdings Company III, Limited is a privately-owned, for-profit company organized, existing, and doing business under and by virtue of the laws of Bermuda, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

12. Defendant Warner Chilcott Corporation is a wholly-owned indirect subsidiary of Warner Chilcott Holdings Company III, Limited and is the direct 100% shareholder of Warner Chilcott (US) Inc. Warner Chilcott Corporation is organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

13. Defendant Warner Chilcott (US) Inc., is a wholly-owned subsidiary of Warner Chilcott Corporation. Warner Chilcott (US) Inc., is organized, existing, and doing business under

and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

14. Galen (Chemicals) Ltd., is organized, existing, and doing business under and by virtue of the laws of the Republic of Ireland. Galen Chemicals is directly or indirectly owned or controlled by Warner Chilcott Holdings Company III, Ltd. Galen Chemicals entered into the anti competitive agreement that prevents Barr's generic Ovcon 35 entry challenged herein.

15. Defendant Barr is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware. Barr's office and principal place of business is located at 2 Quaker Road, P.O. Box 2900, Pomona, New York 10970-0519.

## IV. CLASS ACTION ALLEGATIONS

16. Plaintiff brings this action on behalf of itself and, under Rule 23 of the Federal Rules of Civil Procedure, as representative of a class defined as follows:

> All persons or entities who have directly purchased Ovcon 35 from Warner Chilcott at any time during the period of April 22, 2004, through and including the present (the "Class").

Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries or affiliates.

17. Members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, direct purchasers of Ovcon 35 include wholesalers, hospitals, health maintenance organizations, and/or retail chain drug stores. The exact identities of Class members are ascertainable from, among other sources, the records of Defendants.

5

18.  Plaintiff's claims are typical of the Class. Plaintiff and all members of the Class have incurred overcharges because they were deprived of the ability to substitute a cheaper generic version of Ovcon 35 and/or pay substantially lower prices on their purchases of Ovcon 35 as a result of the wrongful exclusion of Barr's AB-rated generic version.

19.  Plaintiff will fairly and adequately represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

20.  Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex antitrust class actions, particularly antitrust class action litigation relating to the pharmaceutical industry.

21.  Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class.

22.  Questions of law and fact common to the Class include:

   a.  the existence and duration of the contract, combination or conspiracy in restraint of trade alleged herein;
   b.  whether the contract, combination or conspiracy alleged herein constitutes a per se violation of Section 1 of the Sherman Act;
   c.  if the contract, combination or conspiracy alleged herein does not constitute a per se violation, whether it otherwise represents an unreasonable restraint of trade under Section 1 of the Sherman Act;
   d.  whether the activities of Defendants as alleged herein have substantially affected interstate commerce; and
   e.  whether, and to what extent, the conduct of Defendants caused antitrust injury to the business or property of Plaintiff and the members of the Class, and if so, the appropriate measure of damages.

23.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of

6

similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

24. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## V. FACTUAL BACKGROUND

A. **Federal Regulations**

25. In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (the "Hatch-Waxman Amendments"), amending the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. §§ 301-392. Under the Food, Drug, and Cosmetics Acts, pioneer drug manufacturers must obtain FDA approval for any new drug by filing a New Drug Application ("NDA"), which requires the submission of specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.

26. A company seeking FDA approval to market a new drug (i.e., a branded drug) must file a New Drug Application (NDA) demonstrating the safety and efficacy of its product. 21 U.S.C. § 355(b) (2005).

7

27.     An "AB-rated" drug is one that the FDA has determined to be bioequivalent to a branded drug. A generic drug is considered bioequivalent to a branded drug if it contains the same active pharmaceutical ingredient as the branded drug, and if there is no significant difference in the formulation, quality and effectiveness of the two drugs. 21 U.S.C. § 355(j)(8)(B) (2005).

28.     A company seeking to market an "AB-rated" generic version of a branded drug may file an Abbreviated New Drug Application (ANDA) with the FDA. 21 U.S.C. § 355(j) (2005).

29.     Typically, generic versions of brand-name drugs are initially priced significantly below the corresponding brand-name version of the drug. As a result, direct purchasers substitute generic versions of the drug for some or all of their purchases. As time passes, prices for generic versions of a drug tend to decrease even further. Moreover, the brand-name drug continues to lose even more sales and market share to the generics. This price competition enables all direct purchasers of the drugs to: (a) purchase lower-priced generic versions of a drug in substitution for the brand; and/or (b) purchase the brand-name drug at reduced prices. Consequently, in order to maintain their sales of a brand-drug at higher prices, brand-name drug manufacturers have a substantial and compelling financial interest in delaying generic competition.

B.     **Warner Chilcott's Ovcon 35 Oral Contraceptive**

30.     Ovcon 35 was originally approved by the FDA in 1976, and it is not subject to patent protection. Warner Chilcott acquired Ovcon 35 from Bristol-Myers Squibb Company on

8

January 26, 2000. As part of the acquisition, Bristol-Myers Squibb Company agreed to supply (and has supplied) Ovcon 35 to Warner Chilcott.

31.     Ovcon 35's net dollar sales have more than doubled since 2000, even as Warner Chilcott has raised Ovcon 35's price.

32.     Ovcon 35 is, and has been, one of Warner Chilcott's highest revenue-producing products.

33.     Warner Chilcott sells Ovcon 35 at a price substantially above Warner Chilcott's cost of acquiring the product.

34.     Ovcon 35 is highly profitable for Warner Chilcott. For the twelve months ending September 30, 2004, Warner Chilcott's net sales of Ovcon 35 were approximately $71.5 million.

C.     The Threat Posed to Warner Chilcott by Entry of Barr's Generic Ovcon 35

35.     In September 2001, Barr filed an Paragraph I Certification ANDA with the FDA for approval to manufacture and sell an AB-rated generic version of Ovcon 35, on the basis that no patent for the pioneer drug (Ovcon 35) had been filed with the FDA.

36.     In January 2003, as reported by several news publications, including the Guardian (UK), Barr publicly announced its intention to market generic Ovcon 35 by the end of that year.

37.     Barr planned to price generic Ovcon 35 at approximately 30 percent less than the price that Warner Chilcott charges for branded Ovcon 35.

38.     Barr projected that its generic Ovcon 35 would capture approximately 50 percent of Warner Chilcott's branded Ovcon 35 sales within the first year of introduction.

39.     Warner Chilcott expected that Barr would price its generic Ovcon 35 at approximately 30 percent less than the price Warner Chilcott charges for branded Ovcon 35.

40. Warner Chilcott projected that generic Ovcon 35 would capture at least 50 percent of Ovcon 35's new prescriptions within the first year of introduction. Warner Chilcott calculated that, as a result of these lost prescriptions, its net revenues from the sale of branded Ovcon 35 would decline by at least $100 million over a three year period.

41. Warner Chilcott had planned to protect its Ovcon 35 revenues from generic competition by introducing a chewable form of the product (Ovcon 35 Chewable) before generic Ovcon 35 entry occurred. Warner Chilcott's strategy was to convert its Ovcon 35 customers to Ovcon 35 Chewable and to stop selling Ovcon 35. The January 17, 2003 publication of the Irish Times quotes a Galen spokesman as saying "At some stage there was going to be generic competition to Ovcon, which is why we took the step of filing the line extension."

42. Prescriptions for Ovcon 35 Chewable could not be filled at the pharmacy with a generic Ovcon 35 product (absent express approval of the patient's physician), because any generic version of Ovcon 35 would not be AB-rated to Ovcon 35 Chewable.

43. By mid-2003, however, Warner Chilcott's "switch" strategy to protect its Ovcon 35 revenues - by converting customers to Ovcon 35 Chewable before generic Ovcon 35 entry - was in jeopardy. Barr's generic Ovcon 35 entry appeared imminent, and Ovcon 35 Chewable had not obtained FDA approval.

44. In May 2003, Warner Chilcott's chief financial officer warned the company's Board of Directors that generic Ovcon 35 entry was the "biggest risk to the company."

D. **The Defendants' Horizontal Agreement Not to Compete**

45. By the summer of 2003, Warner Chilcott believed that Barr's generic Ovcon 35 entry could occur as early as September of that year.

10

46.    In August 2003, Warner Chilcott and Barr discussed a possible business arrangement under which Barr would agree to refrain from competing in the United States with its generic Ovcon 35 product.

47.    On September 10, 2003, Warner Chilcott and Barr executed a letter of intent. According to the letter of intent, Warner Chilcott would pay Barr $20 million and Barr would not compete in the United States for five years with its generic Ovcon 35 product when Barr received final FDA approval. Instead of entering and competing, Barr would agree to be available as a second supplier of Ovcon 35 to Warner Chilcott if Warner Chilcott so requested.

48.    In February 2004, FTC staff notified Warner Chilcott and Barr that it intended to investigate the non-compete agreement outlined in the defendants' letter of intent because of its potential to significantly reduce competition by eliminating the only generic alternative to Ovcon 35.

49.    On March 24, 2004, Defendants signed their Final Agreement implementing the letter of intent. Warner Chilcott paid Barr $1 million upon signing the Final Agreement.

50.    Under the Final Agreement, within 45 days after the FDA approved Barr's generic Ovcon 35 ANDA, Warner Chilcott could elect to pay the remaining $19 million to secure Barr's agreement to refrain from marketing generic Ovcon 35 in the United States, either by itself or through a licensee, for five years. The Final Agreement referred to this arrangement as Warner Chilcott's option to an exclusive license to Barr's ANDA for generic Ovcon 35.

51.    In addition, the Final Agreement gave Warner Chilcott the ability to purchase Ovcon 35 supply from Barr, pursuant to specified payment terms. The ability to purchase supply from Barr would arise, however, only after Barr received final FDA approval for its generic

11

Ovcon 35. Both Warner Chilcott and Barr understood that if, upon receiving FDA approval, Barr went ahead and entered the market with its generic Ovcon 35 product, Warner Chilcott's Ovcon 35 supply needs would immediately be drastically reduced.

### E. The Defendants Carry Out Their Horizontal Agreement Not to Compete

52. On April 22, 2004, the FDA approved Barr's ANDA to produce and market generic Ovcon 35.

53. But for the agreement, upon receiving final FDA approval for its generic Ovcon 35 ANDA, Barr would have had the desire, intent, and capability to market generic Ovcon 35 in the United States immediately.

54. On April 23, 2004, Barr publicly announced its intention to market generic Ovcon 35 if Warner Chilcott chose not to exercise its exclusive license option.

55. On May 6, 2004, Warner Chilcott exercised the exclusive license option under the Final Agreement by paying Barr $19 million.

56. Warner Chilcott did not begin purchasing Ovcon 35 supply from Barr at that time, but instead continued to purchase Ovcon 35 supply solely from Bristol-Myers Squibb Co. until about May 2005.

57. Under the terms of the Final Agreement, Barr cannot sell generic Ovcon 35 in the United States for five years, or until approximately May 2009. Absent its agreement not to compete with Warner Chilcott, Barr would have started selling generic Ovcon 35 shortly after receiving final FDA approval in April 2004.

58. Entry of Barr's generic Ovcon 35 into the United States would have quickly and significantly reduced the sales of Warner Chilcott's branded Ovcon 35, and led to a significant reduction in the average price Plaintiff and the Class paid for Ovcon 35 products.

59. Barr has abided by its agreement not to sell generic Ovcon 35 in the United States.

60. As of the date of this complaint, Barr remains the only company that has received approval from the FDA to make and sell an AB-rated generic version of Ovcon 35.

61. On November 7, 2005 the FTC filed a complaint against Defendants in the United States District Court for the District of Columbia seeking to permanently enjoin Defendants from continuing to engage in their unlawful conduct. Twenty-one states and the District of Columbia have filed a related complaint in the United States District Court for the District of Columbia.

## VI. TRADE AND COMMERCE

62. At all material times, Ovcon 35 was shipped across state lines and sold by Warner Chilcott to customers located outside the state of manufacture.

63. During the relevant time period, in connection with the purchase and sale of Ovcon 35, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

64. During the relevant time period, various devices were used to effectuate the conspiracy alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign telephone commerce. The activities of Defendants as charged in this complaint were within the flow of, and have substantially affected, interstate commerce.

## VII. VIOLATIONS ALLEGED

### Count I (against all Defendants)
### Violation of Section 1 of the Sherman Act

65. Plaintiff incorporates by reference the allegations set forth above, as if fully set forth herein.

66. Beginning on or about September 10, 2003, when Defendants executed their letter of intent, Defendants engaged in a continuing agreement, combination or conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

67. The Defendants' contract, combination or conspiracy has included concerted action and undertakings between Defendants for the purpose and effect of: (1) eliminating competition between Warner Chilcott and Barr in the sale of Ovcon 35 and AB-rated generic versions thereof; (2) allocating a portion of Warner Chilcott's supra-competitive profits in the sale of Ovcon 35 to Barr in exchange for Barr's agreement not to sell its generic version of Ovcon 35 for 5 years; (3) fixing, raising, maintaining, or stabilizing the price of branded Ovcon 35 at supra-competitive levels; and (4) depriving Plaintiff and the Class of the ability to purchase cheaper competitive generic versions of Ovcon 35.

68. For the purpose of formulating and effectuating their contract, combination or conspiracy, Defendants performed various acts, as alleged herein, including the following:

    a. entering into an illegal agreement by which Barr agreed not to sell its generic Ovcon 35 in U.S. commerce in exchange for sharing Warner Chilcottt's supra-competitive profits, and

    b. depriving direct purchasers of the ability to purchase Ovcon 35 generic equivalents at competitive prices.

69. The acts done by the Defendants as part of, and in furtherance of, their contract, combination or conspiracy were authorized, ordered or done by their officers, agents, employees or representatives while actively engaged in the management of Defendants' affairs.

70. Defendants' illegal contract, combination or conspiracy to prevent the introduction into the U.S. marketplace of a competing generic version of Ovcon 35 resulted in Plaintiff and the Class paying more than they would have paid for Ovcon 35, absent Defendants' illegal conduct.

71. Defendants' contract, combination or conspiracy is a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

72. In the alternative, Defendants' contract, combination or conspiracy violates Section 1 of the Sherman Act, 15 U.S.C. § 1, under a "Quick Look" analysis and/or under a full "Rule of Reason" analysis, because its purpose and effect was to unreasonably restrain competition in the United States market for Ovcon 35 and its generic equivalent.

73. To the extent the law requires it, the relevant geographic market is the United States and its territories.

74. To the extent the law requires it, the relevant product market is Ovcon 35 and its AB-rated generic equivalents.

## VIII. EFFECTS

75. Defendants have undertaken the foregoing unlawful courses of conduct for the following purposes and with the following effects:

    a. All of the sales of Ovcon 35 have been allocated to Warner Chilcott, with a portion of Warner Chilcott's supra-competitive profits being allocated to Barr, in exchange for its agreement not to compete with Warner Chilcott;

  b. Prices for Ovcon 35 have been fixed, raised, maintained or stabilized at artificially high and non-competitive levels;

  c. Buyers of Ovcon 35 have been deprived of the benefits of free and open competition in their purchases, including the ability to purchase a competing generic version of Ovcon 35; and

  d. Competition in the production and sale of Ovcon 35 has been restrained, suppressed and eliminated.

## IX. DAMAGES TO MEMBERS OF THE CLASS

76. During the relevant period, members of the Class purchases substantial amounts of Ovcon 35. As a result of the illegal conduct of Defendants, members of the Class were compelled to pay, and did pay, artificially inflated prices for Ovcon 35. Those prices were substantially greater than the prices that members of the Class would have paid absent the illegal agreement, combination or conspiracy alleged herein, because they were deprived of the opportunity to: (1) pay lower prices for the generic version of the drug; (2) pay lower prices for their Ovcon 35 requirements by switching more of the volume of their purchases from the brand to the generic versions; and (3) pay lower prices for the brand-drug Ovcon 35.

## X. DEMAND FOR JURY

77. Plaintiff demands trial by jury on all issues so triable.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully prays that:

 a) The Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure;

 b) The Court declare that the defendants have committed the violations of the Sherman Act alleged herein;

c)  Each Class member recover three-fold the damages determined to have been sustained by each of them; and that joint and several judgment be entered against each defendant in favor of the Class;

d)  The Class recover its costs of suit, including reasonable attorney's fees as provided by law; and

e)  The Class be granted such other relief as the Court determines to be just.

David U. Fierst, #912899
STEIN, MITCHELL & MEZINES LLP
1100 Connecticut Avenue, N.W.
Suite 1100
Washington, D.C. 20036
Tel: 202-737-7777
Fax: 202-296-8312

Dated: November 10, 2005

Bruce E. Gerstein
Barry S. Taus
Kevin S. Landau
GARWIN GERSTEIN & FISHER LLP
1501 Broadway
Suite 1416
New York, NY 10011
Tel: 212-398-0055
Fax: 212-764-6620

J. Gregory Odom
Stuart Des Roches
ODOM & DES ROCHES, LLP
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

David P. Smith
PERCY, SMITH & FOOTE LLP
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Tel: (318) 445-4480
Fax: (318) 487-1741

Mitchell W. Berger
Rene D. Harrod
BERGER SINGERMAN, P.A.
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, FL 33301
Tel: (954) 525-9900
Fax: (954) 523-2872